**No. 25-10346**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

Jocelyn Nanette Knotts, Individually and in her capacity as representative of the Estate of Kenneth Wayne Knotts, Deceased; Kenith Price; Ladonna Blanchard, Individually, and as Next Friend of K.W.K and L.U.K, minors; Nekeisha Sanders, Individually, and as next friend to K.S. and K.S., minor children,

Plaintiffs-Appellants

v.

Brandon Ledbetter; Anaid Vejar; Barry Secrest; Donald McKenzie; John Does 5-10,

Defendants-Appellees

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

---

### APPELLANTS' BRIEF

---

| | |
|---|---|
| **Shelby J. White** | **Geoff J. Henley** |
| Texas Bar No. 24084086 | Texas Bar No. 00798253 |
| swhite@dpslawgroup.com | ghenley@henleylawpc.com |
| **Thad D. Spalding** | **Rossina Ortega** |
| Texas Bar No. 00791708 | Texas Bar No. 24125048 |
| tspalding@dpslawgroup.com | rortega@henleylawpc.com |
| **Durham, Pittard & Spalding, LLP** | **Will Smith** |
| P.O. Box 224626 | Texas Bar No. 24110380 |
| Dallas, Texas 75222 | wsmith@henleylawpc.com |
| Telephone: (214) 946-8000 | **Henley & Henley, PC** |
| Facsimile: (214) 946-8433 | 2520 Fairmount St., Suite 200 |
| | Dallas, Texas 75201 |
| | Telephone: (214) 821-0222 |
| | Facsimile: (214) 821-0124 |

**ATTORNEYS FOR PLAINTIFFS-APPELLANTS**

<u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record for Appellants Jocelyn Nanette Knotts, Individually and in her capacity as representative of the Estate of Kenneth Wayne Knotts, Deceased; Kenith Price; Ladonna Blanchard, Individually, and as Next Friend of K.W.K and L.U.K, minors and Nekeisha Sanders, Individually and as next friend to K.S. and K.S., minor children, certify that the following listed persons and entities as described in the fourth sentence of 5th Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellants | Counsel for Appellants: |
|---|---|
| Jocelyn Nanette Knotts, Kenith Price, Ladonna Blanchard, Nekeisha Sanders | DURHAM, PITTARD & SPALDING, LLP Shelby J. White |

| Appellees: | Counsel for Appellees: |
|---|---|
| Brandon Ledbetter, Anaid Vejar, Barry Secrest, Donald McKenzie, John Does 5-10 | OFFICE OF THE TEXAS ATTORNEY GENERAL Christopher Lee Lindsey |

*/s/ Shelby J. White*

**Shelby J. White**

Attorney of record for Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants request oral argument as they believe that oral argument will assist the Court in understanding and having a clearer picture of the events and conduct—particularly the relationship between the pleadings and the video of the event—that resulted in Kenneth Knotts's egregious death.

# TABLE OF CONTENTS

**PAGE(S)**

Certificate of Interested Persons ........................................................... ii

Statement Regarding Oral Argument ............................................... iv

Table of Contents ...................................................................... v

Table of Authorities ............................................................... vii

Jurisdictional Statement ............................................................. 1

Issue Presented ........................................................................ 2

Statement of the Case ............................................................... 3

    I.    Factual History ........................................................... 3

    II.   Procedural History ................................................... 10

Summary of the Argument ...................................................... 11

Argument and Authorities ...................................................... 13

    I.    Standard of Review ................................................... 13

    II.   Qualified immunity and the Plaintiffs' pleading burden. ............ 13

    III.  Plaintiffs' complaint adequately pled factual allegations supporting a claim for excessive force under the Fourth Amendment. ...................................................................... 14

        A.   The district court erred in making credibility determinations as to the strength of Plaintiffs' claims. ........ 14

        B.   The Officers used deadly force on Knotts by placing him in a prone position and then applying weight to his back and abdomen. ................................................ 16

C.    Because Knotts was restrained and not resisting when the Officers applied deadly force, the force used was constitutionally excessive. ........................................................25

IV.    Plaintiffs' demonstrated that the excessive force violation was clearly established........................................................27

Conclusion and Prayer ........................................................31

Certificate of Compliance ........................................................33

Certificate of Service ........................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abdullahi v. City of Madison*,
   423 F.3d 763 (7th Cir. 2005) ............................................................20

*Amador v. Vasquez*,
   961 F.3d 721, 730 (5th Cir. 2020) ....................................................29

*Ambler v. Nissen*,
   116 F.4th 351 (5th Cir. 2024), *cert. denied*, No. 24-1051, 2025
   WL 1287084 (U.S. May 5, 2025) ........................................17, 19, 21

*Arnold v. Williams*,
   979 F.3d 262 (5th Cir. 2020) .......................................................13, 14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...........................................................................14

*Darden v. City of Fort Worth*,
   No. 4:15-CV-221-A, 2016 WL 4257469 (N.D. Tex. Aug. 10,
   2016), rev'd in part, vacated in part sub nom., *Darden v. City
   of Fort Worth, Tex.*, 880 F.3d 722 (5th Cir. 2018) ...........................20

*Darden v. City of Fort Worth, Tex.*,
   880 F.3d 722 (5th Cir. 2018) ...............................................11, 20, 29

*Flores v. City of Palacios*,
   381 F.3d 391 (5th Cir. 2004) .............................................................16

*Graham v. Connor*,
   490 U.S. 386 (1989) ........................................................16, 25, 29, 30

*Gutierrez v. City of San Antonio*,
   139 F.3d 441 (5th Cir. 1998) ...............................................11, 20, 28, 30

*Harmon v. City of Arlington, Tex.*,
   16 F.4th 1159 (5th Cir. 2021) ............................................................15

*Hope v. Pelzer*,
    536 U.S. 730 (2002)..................................................................28

*Kisela v. Hughes*,
    584 U.S. 100 (2018)..................................................................27

*Lytle v. Bexar Cnty.*,
    560 F.3d 404 (5th Cir. 2009)....................................................26

*Mace v. City of Palestine*,
    333 F.3d 621 (5th Cir. 2003)....................................................17

*Newman v. Guedry*,
    703 F.3d 757 (5th Cir. 2012)....................................................25

*Peña v. City of Rio Grande City*,
    879 F.3d 613 (5th Cir. 2018)....................................................16

*Reyes v. Bridgwater*,
    362 Fed. App'x 403 (5th Cir. 2010)..........................................17

*Rios v. City of Del Rio, Tex.*,
    444 F.3d 417 (5th Cir. 2006)....................................................14

*Santander v. Salazar*,
    133 F.4th 471 (5th Cir. 2025)...................................................13

*Taylor v. Riojas*,
    141 S. Ct. 52 (2020).................................................................25

*Tennessee v. Garner*,
    471 U.S. 1 (1985).....................................................................17

*Timpa v. Dillard*,
    20 F.4th 1020 (5th Cir. 2021).................................11, 17, 18, 19

*United States v. Diebold, Inc.*,
    369 U.S. 654 (1962)..................................................................27

*United States v. Lanier*,
    520 U.S. 259 (1997)..................................................................28

*Vincent v. City of Sulphur*,
    805 F.3d 543 (5th Cir. 2015)..................................................28

*White v. Pauly*,
    580 U.S. 73 (2017)...........................................................27, 28

*Winder v. Gallardo*,
    118 F.4th 638 (5th Cir. 2024)..............................................15

**Statutes & Rules**

28 U.S.C. § 1291.......................................................................1

28 U.S.C. § 1331.......................................................................1

28 U.S.C. § 1367.......................................................................1

42 U.S.C. § 1983...............................................................1, 2, 11

Fed. R. Civ. Pro. 8..................................................................13

Fed. R. Civ. Pro. 12(b)(6) ......................................................13

**Other Authorities**

Al Baker & J. David Goodman, *The Evolution of William Bratton,
    in 5 Videos*, N.Y. Times (July 25, 2016) ............................23

*Asphyxial Death During Prone Restraint Revisited: A Report of 21
    Cases*, 21 Am. J. Forensic Med. & Pathology 39 (2000) ..............22

Brandon Garrett & Seth Stoughton, *A Tactical Fourth
    Amendment*, 103 Va. L. Rev. 211, 293 (2017) ....................26

Chi. Police Dep't, *Training Bulletin: Positional Asphyxia* (Feb. 6,
    1995) ...................................................................................23

Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*,
    POLICE Mag. (Sept. 9, 2019) .............................................22

Seth W. Stoughton et al., *Evaluating Police Uses of Force* 203
    (2020) ..................................................................................24

ix

Steve Cole, *Screaming Their Last Breath: Why First Responders
    Must Never Ignore The Words "I Can't Breathe,"* Dec. 10, 2015
    (Calibre Press) ................................................................................22

Steven G. Brandl, *Police in America* 252 (2018) ...................................23

U.S. Dep't of Justice, *Principles for Promoting Police Integrity* 4
    (Jan. 2001),
    https://www.ncjrs.gov/pdffiles1/ojp/186189.pdf...................................24

## JURISDICTIONAL STATEMENT

Appellants Jocelyn Nanette Knotts, Individually and in her capacity as representative of the Estate of Kenneth Wayne Knotts, Deceased; Kenith Price; Ladonna Blanchard, Individually, and as Next Friend of K.W.K and L.U.K, minors and Nekeisha Sanders, Individually and as next friend to K.S. and K.S., minor children brought this action under 42 U.S.C. § 1983. ROA.155. The District Court had federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 for the § 1983 claim and state law claims, respectively. On January 31, 2025, the district court entered a final judgment dismissing all claims against all parties. ROA.302. Appellants timely noticed this appeal on February 27, 2025. Fed. R. App. P. 4; ROA.318. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## ISSUE PRESENTED

Were the Defendant Officers entitled to qualified immunity where Plaintiff-Appellants' live complaint adequately stated a claim under section 1983 that (1) the Defendant Officers used excessive, deadly force against Knotts, and (2) the law was clearly established that a reasonable officer would not have kept Knotts, who was restrained and not resisting, in a prone position with weight or pressure on his shoulders, back, or stomach?

## STATEMENT OF THE CASE

### I.    Factual History

On November 29, 2022, at around 8:00 a.m., Kenneth Knotts was traveling with two of his children to Austin when he got a flat tire. ROA.158. He was confronted by officers from the Hutchins Police Department, who determined that Knotts was in the throes of a mental health crisis. ROA.158. Hutchins Police took Knotts into custody and transported him to UT Southwestern for treatment. ROA.158.

Knotts remained at UT Southwestern for several hours until, at around 11:45 a.m., Knotts ran several blocks away from the hospital to a parking lot before he was cornered by officers who gave chase. ROA.158; ROA.195. Defendant Officers Barry Secrest and Anaid Vejar wrestled Knotts to the ground and Defendant Officer Brandon Ledbetter restrained Knotts with a double set of handcuffs.[1] ROA.195. Paramedics arrived shortly thereafter and lifted Knotts onto a gurney to transport him back to the hospital. ROA.160. At 12:07 p.m., paramedics wheeled Knotts back to a room at UT Southwestern. ROA.160.

---

[1] The double set of handcuffs are actually two pairs of handcuffs linked together, which offer a handcuffed subject a greater range of motion.

Knotts was handcuffed and strapped down to the gurney. ROA.160. The paramedics rolled Knotts next to the hospital bed, but rather than slide Knotts onto the bed, face up and with his appendages strapped to the bed, the officers and staff simply left him handcuffed on the gurney sitting up. ROA.160, ROA.228 at 48:15-49:13.

During this period Knotts made multiple statements like "Don't kill me!" and "Don't smother me." ROA.160, ROA.240, ROA.228 at 48:16-37. When a nurse walked in with a power coiled power cord, he added, "Don't hang me." ROA.160, ROA.228 at 49:25. During this time, Knotts repeatedly stated and even yelled that he was thirsty. ROA.160. His requests and demands for water were initially refused. ROA.160, ROA.228 at 50:38-50. Nursing staff and some officers then exited the room, leaving the handcuffed Knotts with Corporal Secrest and Officer Vejar. ROA.160, ROA.228 at 52:11.

Knotts went to the sink, which has a motion detector that turns on the water. ROA.160, ROA.228 at 52:26. He bent over, turned his head, and took several drinks. ROA.160. After he finished drinking, Knotts appeared to squat down and one of the officers accused Knotts of trying to reposition his handcuffs. ROA.160, ROA.228 at 53:00.

Officers Secrest and Ledbetter then took him back to the bed and pushed him back onto it. ROA.161. However, he was initially seated upright with the double set of handcuffs secured behind his back. ROA.228 at 53:11. Officer Ledbetter then placed another single set of handcuffs on Knotts's wrist, ostensibly to change from the double set to the single set. ROA.161, ROA.228 at 53:14 While changing out the handcuffs, the officers rolled Knotts onto his stomach. ROA.161. While the Officers claim to have forcibly placed Knotts on his stomach because he was struggling, there is no indication that Officer Ledbetter was unable to change out the handcuffs with Knotts sitting upright.

The Officers placed Knotts on the bed such that his body was perpendicular across the bed, with his stomach pressed against the side of the bed and his legs hanging over its side. ROA.161, ROA.228 at 53:50. Using their hands, forearms, elbows and bodies, the Defendant Officers then pressed Knotts's torso into the bed and wedge his legs against the side. ROA.161, ROA.229 at 18:10-21:24. Knotts's legs were dangling off the floor, meaning that he bore both his own weight and those of the multiple officers on his stomach and chest – a position that is widely-recognized as carrying

5

a significant risk of asphyxiation. Ultimately, Knotts remained in this prone

position for nearly five minutes.



ROA.229 at 19:24.

Approximately thirty seconds after the Defendant Officers turned him

onto his stomach, Knotts yelled, "What the f*** are y'all doing?" ROA.161,

ROA.229 at 18:30.  Officer Vejar told Knotts that they were removing the

handcuffs, but in fact, Officer Ledbetter had just placed a new set of

handcuffs on Knotts's wrists that restricted Knotts's movement even more.

ROA.161, ROA.229 at 18:32. Unsurprisingly, Knotts, who was already

agitated and in the midst of a mental health crisis, may have been even more

confused by the communications. ROA.161. While Defendants Ledbetter, Vejar and Secrest pushed down on Knotts's back with their hands, arms and bodies, Defendant McKenzie wedged Knotts's stomach against the side of the bed.

During this time, Knotts yells, "I can't breathe!" loud enough for a nurse who was outside of the room to hear it distinctly. ROA.163, ROA.228 at 54:56, ROA.229 at 19:08. For the next 30 seconds, Knotts groaned and grunted. Knotts managed to lift up his head more than once in the first few seconds, but over the next three and a half minutes, he did not move. ROA.163-64, ROA.229 at 19:08-21:24. At one point, he is given a sedative by hospital staff. ROA.228 at 56:44 ("That's five in left glute" [referring to sedative dose]). Knotts can be heard struggling to breathe and crying. ROA.228 at 56:56. After approximately three and a half minutes of applying pressure, Officers Vejar, Secrest and McKenzie finally stepped away from Knotts's lifeless body. ROA.164, ROA.229 at 21:24.

By this time, only Officer Ledbetter remained in contact with Knotts, leaning over the bed with his forearm on Knotts's shoulder. ROA.164, ROA.229 at 21:24. Officer Ledbetter continued to remain in that position for

another 40 seconds after the other officers had backed away. ROA.164, ROA.229 at 22:08.



ROA.228 at 58:19.

Knotts remained slumped over, prone, and unresponsive until a female nurse finally notices that he is nonresponsive and emphatically stated, "Flip him over." ROA.164, ROA.229 at 22:45-56. Seconds later, nursing staff called out, "No pulse. No pulse!" and brought in the "crash cart" with the defibrillation equipment. ROA.164, ROA.229 at 23:10. Ultimately, hospital staff were unable to revive Knotts. ROA.164.

During the five minutes he was prone, Knotts groaned, grunted, and said he could not breathe. Initially his breathing was labored, but after a

minute or so, he appears to lose consciousness and becomes silent. During the entire time, Defendants forcibly kept the handcuffed Knotts prone and restrained.

Following Knotts's death, the Dallas County Medical Examiner, Dr. Travis Danielsen, autopsied the body and concluded the following:

> Based on the case history, autopsy findings, and review of law enforcement bodyworn camera footage, it is my opinion that Kenneth Knotts, a 41-year-old Black male, died as a result of sudden cardiac arrest cause associated with physical restraint and semi-prone position.

ROA.159. The Dallas County Medical examiner further concluded the manner of death was a "Homicide." ROA.159.

In his autopsy report, Dr. Danielsen explained his conclusion. Dr. Danielsen reported finding a "3 x 2 inch contusion" on the "lateral right side of the upper chest" of Knotts's body and "two ¼ inch abrasions on the mid back. ROA.159. Overall, Knotts's heart was in a normal, relatively healthy condition. ROA.159. Dr. Danielsen found that there were no obstructions in the pulmonary arteries or any in the atria or ventricles. ROA.159. However, Dr. Danielson's examination of the lungs indicated that Knotts had congested parenchyma, which is consistent for asphyxia. ROA.159.

## II.   Procedural History

After Knotts's death, Plaintiffs filed suit against the UT Southwestern officers who killed Knotts. ROA.9. After obtaining the body camera footage and filing their Second Amended Complaint, the Officers moved to dismiss, claiming that Plaintiffs' failed to allege facts sufficient to (1) establish that the officers had used excessive, deadly force or (2) defeat their qualified immunity defenses. ROA.155, ROA.195. The district court agreed with the Officers and ultimately entered a final judgment concluding that (1) the officers did not use excessive, deadly force, and (2) even if they did, doing so under these circumstances did not violate clearly established law. ROA.302. This appeal timely followed. ROA.318.

## Summary of the Argument

The district court erred by failing to apply the proper standard of review to the motion to dismiss. Instead of looking to the Plaintiffs' complaint to determine if it stated a viable Section 1983 claim, the district court instead looked to the Defendant Officers version of events, ignored the medical examiner's determinations, ignored video evidence in Plaintiffs' favor, and failed to view the video evidence in the light most favorable to Plaintiffs. This misapplication of the 12(b)(6) standard led the district court to erroneously conclude that the officers' use of force that was sufficient to kill Knotts was not deadly force and not excessive. This conclusion flies in the face of the facts in Plaintiffs' complaint, the supporting medical evidence, and the video evidence showing that Knotts was not resisting but rather struggling to breathe.

The district court further erred in concluding that the law was not clearly established regarding the use of prone restraints on non-resisting subjects. But this law has been clearly established since the 1990s, and in fact, this Court's opinions in *Timpa v. Dillard,* 20 F.4th 1020 (5th Cir. 2021), *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998), and *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722 (5th Cir. 2018) support the conclusion

11

that placing a subject in a prone position, even for a short period of time, can constitute deadly and excessive force.

**ARGUMENT AND AUTHORITIES**

## I.    Standard of Review

The District Court's grant of a motion to dismiss under Rule 12(b)(6) is reviewed de novo. *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020).

## II.    Qualified immunity and the Plaintiffs' pleading burden.

"[A]n assertion of qualified immunity in a defendant's answer or motion to dismiss does not subject the complaint to a heightened pleading standard. *Id.* at 267. "When confronted with a qualified-immunity defense at the pleadings stage, the plaintiff must plead *facts* which, if proved, would defeat the claim of immunity. And the district court must do no more than determine whether the plaintiff has 'file[d] a short and plain statement of his complaint, a statement that rests on more than conclusions alone." *Santander v. Salazar*, 133 F.4th 471, 478 (5th Cir. 2025) (internal citations omitted). Thus, a qualified immunity defense does not require that the plaintiff's original complaint exceed the pleading standard of Rule 8 of the Federal Rules of Civil Procedure. *Id.* Instead, in ruling upon the qualified immunity issue, the court considers the threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct

violated a constitutional right?" *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 421 (5th Cir. 2006).

### III. Plaintiffs' complaint adequately pled factual allegations supporting a claim for excessive force under the Fourth Amendment.

#### A. The district court erred in making credibility determinations as to the strength of Plaintiffs' claims.

As in every other instance, "[a]t the 12(b)(6) stage of litigation, it is inappropriate for a district court to weigh the strength of the allegations." *Arnold*, 979 F.3d at 268 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 563 n.8 (2007)). Here, the district court erred by doing exactly that.

"[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Twombly*, 550 U.S. at 563 n.8.

Here, the district court did not follow *Twombly's* directive to evaluate the motion to dismiss in light of Plaintiffs' claims as alleged in their complaint. Instead, the district court made credibility determinations as to the truthfulness of Plaintiffs' allegations regarding the degree of pressure that was used. The district court also disregarded the medical examiner's determinations regarding the use of the prone restraint as the cause of death.

ROA.159. While the district court's conclusion was allegedly based on video evidence of the incident, that video does not show the *amount* of pressure, only the manner in which that pressure was applied. The district court also concluded that Knotts was not prone and that his feet were on the floor, despite the video evidence clearly demonstrating that Knotts was prone and that his feet were off the floor. ROA.246, *e.g.*, ROA.229 at 19:30-34.

The complaint, however, addresses the amount of pressure that was placed on Knotts. The complaint references the medical records which, as the medical examiner pointed out, (1) show that Knotts had bruising on his chest and back, (2) showed signs of asphyxiation in his lungs, and (3) concluded that the cause of death was sudden cardiac arrest "associated with physical restraint and semi-prone position." ROA.159. These assertions run counter to any conclusion that the pressure was somehow light or insufficient to cause injury or death. Plaintiffs' factual allegations in the complaint do not blatantly contradict the video evidence. And, the district court was still required to view the video evidence "in the light most favorable to the plaintiff." *Winder v. Gallardo*, 118 F.4th 638, 643 (5th Cir. 2024) (citing *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1163 (5th Cir. 2021)).

15

In then applying the proper standard to the *Graham* factors, the district court erred in concluding that the factors weighed against a finding of excessive force: (1) there was no crime; rather, Knotts was in the midst of a mental health crisis; (2) he was handcuffed and posed no real threat to any of the multiple officers in the hospital room; and (3) his alleged attempts to "resist" after he stated that he could not breathe are more accurately attributed to "air hunger" (*supra* Section III(C) at 25),  and are not indicative of an intent to resist arrest. *See Peña v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

**B.**  **The Officers used deadly force on Knotts by placing him in a prone position and then applying weight to his back and abdomen.**

"First, whether a particular use of force is "deadly force" is a question of law, not one of law." *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004). Generally, courts have interpreted deadly force to mean "force carrying with it a substantial risk of causing death or serious bodily harm." *Gutierrez v. City of San Antonio,* 139 F.3d 441, 446 (5th Cir. 1998) (internal citations omitted). In analyzing the validity of a deadly force allegation, the courts apply a two-pronged test. "The first part asks 'whether the force used constituted deadly force'; the second considers 'whether the subject posed a

16

threat of serious harm justifying the use of deadly force.'" *Ambler v. Nissen*, 116 F.4th 351, 360 (5th Cir. 2024), *cert. denied*, No. 24-1051, 2025 WL 1287084 (U.S. May 5, 2025) (citing *Timpa v. Dillard*, 20 F.4th 1020, 1028 (5th Cir. 2021)). "The cases on deadly force are clear: an officer cannot use deadly force without an immediate serious threat to himself or others." *Reyes v. Bridgwater*, 362 Fed. App'x 403, 409 (5th Cir. 2010). Thus, the threat to the officer or others must be (1) "immediate" and (2) pose a risk of "serious physical harm," or the use of deadly force is objectively unreasonable as a matter of law. *See, e.g., Tennessee v. Garner,* 471 U.S. 1, 11 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."); *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003).

Here, the district court concluded that "it is dispositive [as to the use of deadly force] that Knotts was not restrained in a fully prone position, none of the officers placed their bodyweight on Knotts to restrain him, and once Knotts stopped resisting, all four officers released him completely within ninety seconds, with only one officers holding Knotts's shoulder down for forty of those seconds." ROA.312. The district court further reasoned that

"no jury could conclude that Defendants exerted deadly force on Knotts under existing caselaw." ROA.312.

This conclusion is belied by two salient points. First, to put it simply, the force was deadly because Knotts died. And, his cause of death was medically determined to be cardiac arrest caused by "physical restraint and [a] semi-prone position" as well as signs of asphyxiation. ROA.159. The video evidence also refutes the district court's conclusion that Knotts was not prone and that no bodyweight was used. In the video it is shown that Knotts's feet are elevated off the floor, meaning that his weight was born on his stomach and upper chest. ROA.246, ROA.229 at 19:24. The amount of pressure being used by the officers cannot be determined from the video, one can only observe which body parts were used to apply said pressure. And, the fact remains that the amount of pressure was enough to kill.

Moreover, multiple officers pressed on Knotts in multiple places, specifically on his lower back, upper back, and legs. *See e.g.,* ROA.229 at 18:10-21:24. This is exactly the type of dangerous positioning and pressure that has led the medical community and police training policies to caution against such methods of restraint. *See e.g., Timpa*, 20 F.4th at 1033 ("In the prone position, an individual is unable to effectively move the diaphragm,

chest wall, and abdomen to breathe. The body is also unable to adequately circulate blood resulting in engorgement and stagnation of blood flow in the upper body. The face, partially or fully, pressed to the ground further decreases oxygenation. When force is on the back and shoulders, it is extremely difficult to move the chest and abdomen."). And, this risk was compounded by Knotts's untreated mental illness, his own size and weight, and his recent physical exertion. *Id.*

Second, the district court's conclusion that the amount of time was not long enough to be deadly force is undercut by this Court's recent opinion in *Ambler v. Nissen*. In that case, as here, Officer Nissen claimed that he used only "soft hand force" for 90 seconds, and therefore it was unforeseeable that such "miniscule" force would result in death. 116 F.4th at 360. The district court and this Court disagreed, holding that an officer takes a plaintiff as he finds him, and such allegedly minimal force may still be unreasonable when the officer is aware of such conditions that may exacerbate or aggravate an existing health condition. *See, e.g., Timpa*, 20 F.4th at 1033 (holding that reasonable jury could find "use of a prone restraint with bodyweight force on an individual with three apparent risk factors—obesity, physical exhaustion, and excited delirium—'created a substantial risk of death or

serious bodily injury.' " (quoting *Gutierrez*, 139 F.3d at 446)); *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 733 (5th Cir. 2018) (finding less than two minutes of prone restraint was clearly excessive).[2]

The Seventh Circuit also considered a similar set of facts in *Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005). In that case, officers restrained a subject in a prone position for only "30-45 seconds." *Id.* at 769. Like in this case, the district court erroneously concluded that the officer had not used unreasonable force because it was only for a short period of time, and the officer's knee was only on the subject's shoulder blade, not his neck or spine. *Id.* at 768-69. However, the Seventh Circuit disagreed, holding that the plaintiff's medical evidence and the video evidence raised a fact issue as to the unreasonable use of force. *Id.* ("the record supports an inference that Brooks knelt on Mohamed with enough force to inflict lethal injuries").

Here, the officers all knew that Knotts was suffering from a mental health episode – that was the reason he was at the hospital and the reason

---

[2] Though the Fifth Circuit's opinion does not mention how long Darden was held in a prone restraint, the district court's order noted that Darden was handcuffed and sat upright "[a]pproximately one minute and 54 seconds after" the officers entered the dwelling. *Darden v. City of Fort Worth*, No. 4:15-CV-221-A, 2016 WL 4257469, at *5 (N.D. Tex. Aug. 10, 2016), rev'd in part, vacated in part sub nom. *Darden,* 880 F.3d 722 (5th Cir. 2018).

they chased him down after he left involuntarily. ROA.158, ROA.202. Knotts

can also be heard on the video stating that he could not breathe, but the

officers all continued to restrain him with pressure. *Ambler*, 116 F.4th at 361

("the court identified enough evidence to conclude that a reasonable officer

could have been aware of Ambler's health issues giving his obvious size and

pleas for air. … This was so even if Nissen applied force for a mere ninety

seconds.").

This Court in *Ambler* summarized the issue precisely:

> Not all plaintiffs are the same, and harmless force in one
> situation could be deadly force in another. While [the officer]
> would have us disregard the context of his encounter with [the
> decedent], doing so would trade nuance for willful blindness.
> And contrary to his view, such an approach is incompatible with
> the Fourth Amendment reasonableness standard.

*Id.*

The use of body weight to restrain a suspect can aggravate the dangers

of the prone position and may quickly turn deadly. For over three decades,

the policing community has agreed that officers should not keep a restrained

individual prone, and police training materials have taught officers of the

danger of positional asphyxia. As early as 1985, police and medical

researchers were aware of a trend of sudden deaths of individuals who were

21

restrained and left lying face-down on their chest or stomachs--so-called "prone restraint." *See* Ronald L. O'Halloran & Janice G. Frank, *Asphyxial Death During Prone Restraint Revisited: A Report of 21 Cases*, 21 Am. J. Forensic Med. & Pathology 39, 47 (2000). Based on this well-established understanding, training materials today consistently teach officers about the dangers of prone restraint and positional asphyxia. For example, Calibre Press--one of the largest and most popular police training providers and publishers of police media--published an article in 2015 explaining that "[m]ost officers know that when a patient is prone, their respirations may be impeded." Steve Cole, *Screaming Their Last Breath: Why First Responders Must Never Ignore The Words "I Can't Breathe*," Dec. 10, 2015 (Calibre Press). To avoid this, officers must "[m]ake sure the suspect is in a position to maximize his tidal volume" and that "[a] subject [is] never [] left prone." *Id*. Because of these well-known and potentially fatal risks, POLICE Magazine--another major police trade publication--summarizes that "[m]any law enforcement and health personnel are now taught to avoid restraining people face-down or to do so only for a short period of time." Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019).

The 1994 NYPD Training Video that warns against prone restraints also instructs that "[i]f, in addition to your own weight, you have someone else kneeling or laying on your back, that increases the amount of weight that you have to raise in order to increase the size of your chest." *See* Al Baker & J. David Goodman, *The Evolution of William Bratton, in 5 Videos*, N.Y. Times (July 25, 2016).[3] And a 1995 Chicago Police Department Training Bulletin warned officers not to "put weight on an arrestee's back, such as with your knee for a prolonged period." Chi. Police Dep't, *Training Bulletin: Positional Asphyxia* (Feb. 6, 1995). That is because "[t]his practice adds stress to the respiratory muscles and inhibits movement of the diaphragm and rib cage." *Id*. Further, the more officers there are "holding a person down in a prone position, the greater the risk that there will [be] pressure on a person's abdomen, making it difficult to breathe." Steven G. Brandl, *Police in America* 252 (2018).

Today, police department policies frequently memorialize the risk of positional asphyxia from prone restraint and instruct officers not to keep suspects prone. Indeed, the Department of Justice's Principles for Promoting

---

[3] nytimes.com/interactive/2016/07/24/nyregion/bratton-nypd-videos.html

Police Integrity as far back as 2001 recommended--under the heading of "Deadly Force"--that "[a]gencies should develop use of force policies that address . . . particular use of force issues such as . . . positional asphyxia." U.S. Dep't of Justice, *Principles for Promoting Police Integrity* 4 (Jan. 2001), https://www.ncjrs.gov/pdffiles1/ojp/186189.pdf.

Because of these well-known and potentially fatal risks, "[o]fficers must be attuned to the amount and duration of any weight they place on [a prone] subject." Seth W. Stoughton et al., *Evaluating Police Uses of Force* 203 (2020). Moreover, officers must not "sit or lean on the abdomen EVER." Brandl at 252 (emphasis in original).

Here, the district court erred in concluding that placing Knotts in a prone position with the weight of multiple officers on top of him did not constitute deadly force. This conclusion finds no support in the case law, the historical precedent and medical literature regarding the dangers of such restraint holds, or the facts of this case.

**C.    Because Knotts was restrained and not resisting when the Officers applied deadly force, the force used was constitutionally excessive.**

The "[l]awfulness of force does not depend on the precise instrument used to apply it." *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012). This Court has repeatedly held that using *any* meaningful force against a subdued, unarmed subject, who is not fleeing and is being arrested for a minor offense, is forbidden unless lesser uses of force have been unsuccessful. *See, e.g.*, *id. at* 757. And it should go without saying that suffocating a non-threatening victim pleading for help is unconstitutional. *See Taylor v. Riojas*, 141 S. Ct. 52 (2020).

Critically, this is not a case where officers faced a split-second decision. To be sure, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. But this was not such a case. Here, the officers had ample time to re-evaluate their continuous use of force because Knotts was brought under control and secured. In such circumstances, "force is not an on/off switch; instead, force must be considered and reconsidered at stages during an

encounter." Brandon Garrett & Seth Stoughton, *A Tactical Fourth Amendment*, 103 Va. L. Rev. 211, 293 (2017); *see also Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for that use of force has ceased [.]").

Nor is this a case where Knotts resisted arrest or posed a danger to himself or others. He was already handcuffed, surrounded by multiple officers, and in the hospital. The district court observed that Knotts "behaved erratically before and during restraint and physically resisted all the officers' attempts to restrain him, shouting things suddenly." ROA.309. However, Knotts's resistance and attempts to lift himself up "are common symptoms of 'air hunger'--the phenomenon described in which an oxygen deficit causes a natural reaction that causes a prone suspect to struggle more violently to get air. *See, e.g.*, Baker & Goodman, *supra* at 10.

More importantly, Knotts was not struggling or moving for the majority of the time that the officers were on top of him. Even his alleged attempts to struggle largely involve him trying to lift his chest off the bed after he said that he could not breathe. ROA.229 at 19:08-19:37. The video clearly shows periods of time where Knotts is not resisting or moving at all,

yet the officers continue to keep body weight on him in a prone position. ROA.229 at 19:08-21:24. In fact, he is still for over a minute between the time that he says he cannot breathe and the time that a sedative is administered. ROA.229 at 19:37-20:55. Even after the sedative is administered, he is unmoving, yet he is still held down for at least another 60 seconds. ROA.229 at 20:55-22:09.

To the extent there are disputed facts about whether Knotts was actively resisting officers, the court must draw all inferences in Knotts' favor. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The district court erred in ignoring the allegations in Plaintiffs' complaint, which were corroborated by the video evidence and the medical examiner's conclusions as to cause of death, and instead simply adopted the Officers' version of events—that Knotts was struggling and that the Officers were justified in continuing to restrain him--to reach its conclusion. This Court should reverse that conclusion.

## IV.  Plaintiffs' demonstrated that the excessive force violation was clearly established.

The Supreme Court has emphasized that its case law "does not require a case directly on point for a right to be clearly established," *Kisela v. Hughes,*

584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)), and that " 'general statements of the law are not inherently incapable of giving fair and clear warning.' " *White*, 580 U.S. at 552 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). While "earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). In this case, however, the district court effectively required what the Supreme Court has always insisted was unnecessary--a prior case with functionally identical facts.

Over two decades ago, this Court found that officers who hog-tied "a drug-affected person in a state of excited delirium" and placed him "face down in a prone position" until he died by asphyxiation violated clearly established law. *Gutierrez*, 139 F.3d at 451. Although no prior case had dealt specifically with hog-tying, this Court rejected the "dogmatic argument" that "the specific action in question [must] have been held unlawful to overcome the official's qualified immunity." *Id*. at 445.

For a rule to put officers on notice, there need not be "a case directly on point," but "there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is

definitively unlawful." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). " '[I]n an obvious case,' the *Graham* excessive-force factors themselves 'can clearly establish the answer, even without a body of relevant case law.' " *Darden*, 880 F.3d at 733. And "case law makes clear that when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced." *Amador v. Vasquez,* 961 F.3d 721, 730 (5th Cir. 2020).

As explained above, *supra*  Section III, ample authority gave officers fair warning that keeping a restrained subject in the midst of a mental health episode prone while applying pressure to his back was an unreasonable use of force that could have deadly consequences. And in fact, the officers moved Knotts from a sitting position to a prone position and rolled him onto his stomach, thereby creating the danger of asphyxiation where none had previously existed. ROA.229 at 17:58-18:03. But most importantly, Knotts was still and compliant for the majority of the time that he was restrained in a deadly prone position.

It is well established and generally accepted that prone restraint can have deadly consequences, particularly in conjunction with placing weight on a suspect's back. The district court's erroneous treatment of *Timpa* as distinguishable because the prone, weighted restraint was for a longer

period of time overlooks the dangers of prone restraint more generally. Instead of asking whether the state of the case law was such that a reasonable officer would know their actions were unlawful, the court rested its conclusion on the *ipse dixit* that some facts in this case were different than the facts of *Timpa*. There has never been any doubt that officers are not lawfully entitled to deploy deadly force on a person who is not resisting arrest, not threatening the safety of others, and not otherwise engaging in meaningful criminal activity. *See Graham*, 490 U.S. at 396.

This Court's decisions in *Gutierrez* and *Timpa* were not some abstract articulation of Fourth Amendment principles, but rather an application of those principles to the specific context of police using "force carry[ing] with it a substantial risk of causing death or serious bodily harm," on a restrained suspect who did not pose a serious risk of injury to others. *Gutierrez*, 139 F.3d at 446. *That* is the proper level of generality for deciding whether prior case law is "particularized" to the facts of a given case, which the district court failed to recognize.

## CONCLUSION AND PRAYER

For these reasons, Appellants respectfully request that this Court reverse the Final Judgment granting the Officers' motion to dismiss and remand all of these claims back to the District Court for further proceedings including trial on the merits.

Respectfully submitted,

By:  */s/ Shelby J. White*

**Shelby J. White**
Texas Bar No. 24084086
swhite@dpslawgroup.com
**Thad D. Spalding**
Texas Bar No. 00791708
tspalding@dpslawgroup.com
**Durham, Pittard & Spalding, LLP**
P.O. Box 224626
Dallas, Texas 75222
Telephone: (214) 946-8000
Facsimile: (214) 946-8433

and

**Geoff J. Henley**
Texas Bar No. 00798253
ghenley@henleylawpc.com
**Will Smith**
Texas Bar No. 24110380
wsmith@henleylawpc.com
**Henley & Henley, PC**
2520 Fairmount St., Suite 200
Dallas, Texas 75201
Telephone: (214) 821-0222

Facsimile: (214) 821-0124

**COUNSEL FOR APPELLANTS**

<u>C</u>ERTIFICATE OF <u>C</u>OMPLIANCE

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 5th CIR. R. 32.1:

    <u>X</u>      this document contains **5,692** words.

    _       this brief uses a monospaced typeface and contains _____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

    <u>X</u>      this document has been prepared in a proportionally spaced typeface using **Microsoft Word 2010 in 14 point, Book Antiqua font**, or

    _       this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

                                   */s/ Shelby J. White*_____
                                   **Shelby J. White**
                                   Attorney of record for Appellants
                                   Date: June 12, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on this June 12, 2025 a true and correct copy of this document was served upon the following counsel of record via electronic filing pursuant to the Federal Rules of Appellate Procedure:

**Christopher Lee Lindsey**, Assistant Attorney General
christopher.lindsey@oag.texas.gov
ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711

***Attorney for Appellees***

*/s/ Shelby J. White*
**Shelby J. White**